NUNLEY v̇ TURNER

1. AUTOMOBILES—INSURANCE—STATUTES—UNINSURED MOTORIST COV-
   ERAGE—REJECTION OF COVERAGE—SPECIFIC REJECTION.

   A now repealed portion of the Insurance Code of 1956 required
   specific notice and specific written rejection of uninsured motor-
   ist coverage by one who purchased a public liability policy on a
   motor vehicle (MCLA 500.3010).

2. JUDGMENT—SUMMARY JUDGMENT—ISSUES OF MATERIAL FACT—WIT-
   NESSES—CREDIBILITY—AUTOMOBILES—INSURANCE—UNINSURED
   MOTORIST COVERAGE.

   Summary judgment is not available whenever a presented issue
   of material fact turns upon the credibility of an affiant or
   witness whose deposition has been taken, and summary judg-
   ment was therefore improperly granted for plaintiff in an
   action for a declaratory judgment, where unequivocal deposi-
   tional evidence of defendant to the effect that plaintiff had
   knowingly rejected the uninsured motorist coverage provided
   by the insurer of his motor vehicle was opposed by the equivo-
   cal depositional disclaimer of plaintiff that he was not able to
   remember the explanation of uninsured motorist coverage and
   by plaintiff's admitted signature on the rejection notice.

3. AUTOMOBILES—STATUTES—INSURANCE—UNINSURED MOTORIST COV-
   ERAGE—STATUTORY REJECTION—SIGNING REJECTION—LEGISLA-
   TIVE INTENT.

   The uninsured motorist coverage in a policy issued by a defend-
   ant insurer on an automobile owned by plaintiff did not apply
   to a motorcycle ridden by plaintiff at the time of a collision
   with an uninsured motorist where plaintiff had purchased the
   public liability policy on a four-wheel vehicle and never in-
   formed his insurer that he had subsequently purchased the
   motorcycle; an opposite rule of law, if extended would mean
   that an insurer to whom a premium had been paid on one car
   would be liable for uninsured motorist coverage on any number
   of motor vehicles purchased by an insured subsequent to the

REFERENCE FOR POINTS IN HEADNOTES
[1–3] 7 Am Jur 2d, Automobile Insurance § 135 *et seq.*

original purchase of uninsured motorist coverage without purchasing such additional coverage; such could not have been the legislative intent in adopting the statute (MCLA 500.3010).

Appeal from Genesee, Donald R. Freeman, J. Submitted Division 2 November 8, 1974, at Lansing. (Docket Nos. 18624 & 18584.) Decided January 8, 1975. Leave to appeal applied for.

Complaint by Terry and Ramona Nunley against Jerry Turner, Jr., Excel Insurance Company, and Farmers Insurance Group, for damages and a declaratory judgment interpretating a portion of the insurance code. Summary judgment for plaintiffs. Defendant insurers appeal. Reversed and remanded.

*Rene J. Ortlieb,* for plaintiffs.

*Skinner & Joseph,* for defendant Excel Insurance Company.

*Chaklos, Jungerheld, Hoffmann & O'Neill, P. C.,* for defendant Farmers Insurance Group.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Joseph B. Bilitzke,* Assistant Attorney General, and *Carl K. Carlsen,* Assistant Attorney General, for defendant Jerry Turner, Jr.

Before: QUINN, P. J., and McGREGOR and O'HARA,* JJ.

O'HARA, J. This is an appeal from a summary judgment granted in a declaratory judgment ac-

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

tion. It was rendered in favor of plaintiffs and against both defendant insurers. The action involves an interpretation of that portion of the Insurance Code of 1956, which we hereinafter set out.

"No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto in limits for bodily injury or death set forth in section 504 of Act No. 300 of the Public Acts of 1949, as amended, being section 257.504 of the Compiled Laws of 1948, under provisions approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles, including owners or operators insured by an insolvent insurer, because of bodily injury, sickness or disease, including death, resulting therefrom, unless the named insured rejects such coverage in writing as provided herein. *All such policies shall contain a notice, displayed prominently on the front page of the policy, in at least 8-point type that such protection coverage was explained to him and that he can reject such coverage by notice in writing.* Unless the named insured requests such coverage in writing, it need not be provided in or supplemental to a renewal policy where the named insured has rejected the coverage in connection with a policy previously issued to him by the same insurer." MCLA 500.3010; MSA 24.13010.[1] (Emphasis supplied.)

As to defendant Excel, by holding as he did, the trial judge made a finding which we quote that "Nunley did not *knowingly* reject the uninsured

---

[1] Repealed by 1972 PA 345.

motorist coverage provided by Excel". (Emphasis supplied.)

If such finding of fact be uncontroverted, it is dispositive. Under a previous holding of this Court, the rejection must have been *knowingly* made. Plaintiff does not contest the fact that his signature is on the rejection provision and that he personally signed it. No question is raised as to the adequacy of the rejection notice as required by statute. We quote from the case in point as to the requirement of knowledgable rejection:

"With the statute the legislature has encouraged the purchase of uninsured motorist coverage by requiring specific notice and specific written rejection of the coverage. The required notices also serve to place to the burden of guaranteeing a knowledgable rejection on the insurance company.

"The reasons behind the legislative encouragement are evident. The increased use of uninsured motorist coverage would tend to reduce the number of claims on the state fund. Furthermore, such insurance would give the insured extra protection over that provided by the Fund." *Oatis v Dairyland Insurance Co,* 20 Mich App 367, 372; 174 NW2d 35 (1969).

Necessarily we review the depositional basis for the trial court's holding that the rejection was not knowingly made. We quote first the testimony of the witness who secured plaintiff's signature on the document rejecting uninsured motorist coverage on the motorcycle.

*(Counsel for defendant Excel):*
"*Q.* Did you take an application from Mr. Nunley?
"*A.* Yes.
"*Q.* And what did you do with the application?
"*A.* Turned it over to Dwight Kittle with the premium.

"*Q.* All right. Did you determine how much the premium was?

"*A.* Yes, I did.

"*Q.* And how much was the premium?

"*A.* Eighty-four Dollars.

"*Q.* Well, now, did that include uninsured motorist coverage?

"*A.* No, it didn't.

"*Q.* What was the total premium?

"*A.* Ninety-three Dollars.

"*Q.* Ninety-three Dollars; and the uninsured motorist coverage was $9?

"*A.* I believe.

"*Q.* And did Mr. Nunley pay for the insurance that day?

"*A.* Yes, he did.

"*Q.* And how much did he pay you?

"*A.* Eighty-four Dollars.

"*Q.* And how do you know that?

"*A.* I have got my receipt.

"*Q.* Could I see it?

"*A.* Yes.

"*Q.* This is a receipt dated April 12, 1971 made out to Terry Nunley. It says on it six months insurance, $84. Is this Mr. Nunley's signature?

"*A.* Yes.

"*Q.* He signed it?

"*A.* Yes.

"*Q.* Now, Mrs. Hoffman, I want to show you this document which has previously been marked defendant's exhibit no. 1. Can you tell us what that is?

"*A.* It is a rejection of uninsured motorist coverage.

"*Q.* Did Mr. Nunley sign that?

"*A.* Yes.

"*Q.* At your place of business?

"*A.* Right.

"*Q.* And at the time—prior to the time he signed that, did you explain to him what uninsured motorist coverage was?

"*A.* I explained—I explained it to everybody. I tell them everything that they are signing.

"*Q.* All right. And did you explain to him what the effect of this rejection would be?

"*A.* Yes; I tell everybody if they reject the uninsured motorist and they are involved in an accident when somebody doesn't have insurance, that their own policy will not cover it.

"*Q.* And that was signed at the time you took his application for insurance?

"*A.* Yes.

"*Q.* And he paid the premium?

"*A.* Um-hum.

"*Q.* Is that correct?

"*A.* Right.

"*Q.* And the $84 in the recap was the premium—was the premium less the uninsured motorist coverage?

"*A.* Yes.

\*   \*   \*

*(Counsel for defendant Farmers):*

"*Q.* And as a matter of fact, in this particular instance, you can't recall talking with Mr. Nunley; is that correct?

"*A.* No.

"*Q.* I see. And the only way that you can recall your conversation or your meeting of this particular individual stems from the fact that you have certain records that indicate that you sold him a cycle, and that you filled out this particular form for an application and for insurance; is that correct?

"*A.* Yes.

"*Q.* Okay. Did you get that answer *(to the reporter)?*

*(Whereupon, the reporter replied in the affirmative.)*

"*Q. (By Mr. O'Neill, continuing):* And it is possible that you would fail to or omit to talk about one of these particular coverages listed on this application, isn't it?

"*A.* No."

As opposed to the foregoing, we quote plaintiffs' version of the same transaction:

*(Counsel for defendant Excel):*

"*Q.* At the time you bought that motorcycle, did you obtain insurance on that motorcycle?

"*A.* Yes, sir.

"*Q.* Public liability insurance?

"*A.* Yes, sir.

"*Q.* And who did you buy that from?

"*A.* Well, from the guy at the cycle company.

"*Q.* You bought it at the cycle company?

"*A.* Yes.

"*Q.* And they arranged the insurance for you?

"*A.* Yes, sir.

"*Q.* And do you know the name of the company that insured your motorcycle?

"*A.* Excel.

"*Q.* Excel?

"*A.* Yes.

"*Q.* Do you know the name of the agency that issued the policy?

"*A.* No, I don't.

"*Q.* Had you ever—

"*A.* I guess Dwight Kittle is his name.

"*Q.* Kittle?

"*A.* On Corunna Road. He was my agent, I guess. That's what I understood.

\* \* \*

"*Q.* Okay. I want to show you this exhibit and ask you if your signature appears on that?

"*A.* Yes, sir.

"*Q.* Is that your signature?

"*A.* Yes.

"*Q.* Do you remember signing that?

"*A.* No.

"*Q.* Beg your pardon?

"*A.* No.

"*Q.* You don't?

"*A.* No. I mean, it's my signature.

"*Q.* It is your signature?

"*A.* Yes.

"*Q.* And up at the top, what does that say, Mr. Nunley?

"*A.* It says rejection of uninsured coverage.

"*Q.* Did you know what that meant?

"*A.* Well, I—not really. I didn't know anything about uninsured motorists. I thought it was just something that come with the insurance.

"*Q.* Did Mrs. Hoffman explain to you what uninsured motorist coverage was?

"*A.* I can't remember—

"*Q.* You don't remember?

"*A.* —if she did or not. I mean, you know, I was trying to think about it and I just can't. I don't remember. I don't remember, you know, what about the details she said; what she said about it or anything like that.

"*Q.* So you don't recall signing this, but you do say that this is your signature; is that right?

"*A.* Yes, sir.

"*Q.* I will ask you again, did anyone explain to you what this document was?

"*A.* Well, like I say, I don't recall exactly what all was said, you know, about the motorcycle that day. I bought the motorcycle that day and I don't recall anybody saying anything like this.

"*Q.* Well, could they have said something to you?

"*A.* They might have. Like I said, I don't remember.

"*Q.* You don't remember?

"*A.* No."

In our state, summary judgments are not particularly favored.

"By insisting that summary judgment is not available whenever a presented issue of material fact turns upon the credibility of an affiant or witness whose deposition has been taken, *we intend thereby to limit severely the circumstances in which summary judgments properly may be entered.* The alternative would require our abandonment of what has been called the 'truth-testing process of cross-examination' and would encourage un-

warranted invasion by judges of the jury's exclusive province." (Citation omitted.) *Cates v Bald Estate,* 54 Mich App 717, 722; 221 NW2d 474 (1974), quoting from *Rizzo v Kretschmer,* 389 Mich 363; 207 NW2d 316 (1973), which supplied emphasis.

We are well aware that this case may be distinguished from *Cates, supra.* The case at bar is for a declaratory judgment whereas *Cates* was an action for medical malpractice.

We do not read the legal philosophy of our Supreme Court to be limited to any certain class of cases. Certainly we do not read it as being unilaterally applicable only as to plaintiffs or defendants.

As against the unequivocal depositional evidence of defendant in this case is the equivocal disclaimer of plaintiff of not being able to remember the explanation of uninsured motorist coverage, and his admitted signature on the rejection notice. Certainly, this is no case for entry of a summary judgment for plaintiffs.

If there were any basis for a summary judgment at all on the ground of no dispute as to a material fact, it would have been in favor of defendant insurer Excel.[2]

Perforce we vacate the summary judgment in favor of plaintiffs and remand for such further proceedings as may properly be taken in the trial court.

Now we discuss the summary judgment entered against defendant Farmers Insurance Group. The question here presented relates to whether or not the uninsured motorist provision in a policy issued by defendant Farmers on a 1970 Ford Maverick

[2] Defendant insurer Excel moved for summary judgment at the trial level and defendant insurer Farmers requested similar relief in this Court.

owned by plaintiff excluded the motorcycle ridden by plaintiff at the time of his collision with an uninsured motorist. We set forth the pertinent provisions, definitions and the exclusion.

"PART II

\*   \*   \*

"DEFINITIONS

\*   \*   \*

"Automobile means a four wheel land motor vehicle designed for use principally upon public roads.

\*   \*   \*

"EXCLUSIONS

"This policy does not apply under Part II:

\*   \*   \*

"(3) to bodily injury to an insured while occupying an automobile or 2 wheel motor vehicle (other than an insured motor vehicle) owned by a named insured or any relative resident in the same household, or through being struck by such vehicles;"

Neither the briefs of plaintiffs-appellees nor of either defendant-insurer cites nor makes any reference to the "trilogy" of opinions handed down by the Supreme Court in 1972. See *Blakeslee v Farm Bureau,* 388 Mich 464; 201 NW2d 786 (1972); *Rowland v Detroit Automobile Inter-Insurance Exchange,* 388 Mich 476; 201 NW2d 792 (1972); *Boettner v State Farm Mutual Insurance Co,* 388 Mich 482; 201 NW2d 795 (1972).

All of the above cases are clearly distinguishable on their facts. In *Boettner* there were two identical policies of insurance, issued by the same company on two different automobiles owned by husband and wife, and upon which two separate uninsured motorist coverage premiums were paid. The Supreme Court allowed recovery by the estates of the

deceased husband and wife under *both* policies. Such is not the situation in the case at bar.

Blakeslee was a passenger in the vehicle of a host-owner driver who collided with an uninsured motorist. Recovery was permitted up to the policy limits from both the host driver's insurer and the injured passenger's uninsured motorist coverage.

*Rowland* was decided on the point that the statute[3] now at issue had not yet been passed at the time the policy was issued and was therefore inapplicable to the facts of that case.

In this case plaintiff, Terry Nunley, owned a conventional four wheel automobile. He bought a standard public liability policy naming it and paying the required premium for uninsured motorist coverage upon it. The policy was issued December 21, 1970.

In April of the following year, plaintiff bought a motorcycle. He purchased a public liability policy upon it and by specific written disclaimer rejected uninsured motorist coverage by signing the required statutory rejection. That policy was issued April 14, 1971 and effective through October 14, 1971.

Thereafter, and on October 2, 1971, plaintiff was injured while riding the motorcycle in a collision with an uninsured motorist. His wife sued derivatively. It is not disputed that plaintiff gave no notice to Farmers of his purchase of the motorcycle nor his purchase of other insurance thereon and rejecting uninsured motorist coverage.

It is hard to see how Farmers could possibly be held liable to plaintiff. Such a rule of law, if extended, would mean that an insurer to whom a premium had been paid on one car would be liable for uninsured motorist coverage on any number of

---

[3] MCLA 500.3010; MSA 24.13010.

motor vehicles bought by an insured subsequent to the original purchase of uninsured motorist coverage without purchasing such additional coverage. We cannot conceive this to have been the legislative intent in adopting the statute. Thus we remand for a hearing on the merits as to defendant Excel and vacate the summary judgment entered in favor of plaintiff against defendant Farmers. We direct the entry of a summary judgment in favor of defendant Farmers and against plaintiffs.

Costs on this appeal to Excel. The balance of the costs as to Excel to abide the final outcome. Farmers may tax costs against plaintiffs-appellees.

All concurred.